Filed 7/11/13  P. v. Goldman CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DON GOLDMAN,<br><br>    Defendant and Appellant. | F063883<br><br>(Super. Ct. No. BF130094A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Don Goldman was charged with first degree premeditated murder (Pen. Code,[1] § 187, subd. (a)) with the personal use of a firearm causing death (§ 12022.53,

---

[1]All further references are to the Penal Code unless otherwise indicated.

subd. (d)) and possession of a firearm by a felon (former § 12021, subd. (a), now § 29800, subd. (b)).  It was further alleged that defendant suffered three prior felonies resulting in prison terms within the meaning of section 667.5 subdivision (b).  After a jury trial, defendant was convicted of the lesser included offense of voluntary manslaughter (§ 192, subd. (a)) and being a felon in possession of a firearm.  In a bifurcated proceeding the trial court found the prior conviction allegations true.  The trial court subsequently sentenced defendant to a 14-year prison term.

On appeal, defendant contends the trial court erred in denying his motion to exclude evidence of a gun and the testimony of a witness pertaining to the gun as the evidence was discovered as the fruit of a violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  He further argues the trial court erred in admitting certain phone records as the records were irrelevant to the proceedings.  We find defendant's contentions without merit and affirm the judgment.

### FACTS

On November 17, 2009, defendant shot and killed his uncle, Steven Henderson, while at the home of his ex-wife, JoAngel Goldman.  There was no dispute at trial that defendant shot Henderson; rather, the issue was whether the killing was premeditated and deliberate, or whether defendant acted in self-defense or from a heat of passion.

Charmaine Goldman, defendant's mother, was with Eric Peterson on the day of the shooting.  The two visited her sister, Gwendolyn Davis, at her home.  Henderson, Charmaine's[2] brother, was there at the time; when she arrived, he asked her what was going on.  She responded she did not know, and Henderson said he was going to check on defendant.  Peterson then gave Henderson a ride to JoAngel's house.

Charmaine did not recall talking to JoAngel anytime before the shooting on the day in question although she had attempted to contact her during the day.  She stated she

---

[2]Due to the fact that several of the witnesses have the same last name, we will refer to them by their first names.  No disrespect is intended.

2.

did not have a working cell phone at the time, and JoAngel did not know Peterson's number.

Davis testified that on the day in question she was at home with Charmaine, Peterson, and Henderson. They were outside talking when Davis decided she needed to go to the store to get cigarettes. She, her sister and Peterson went to the store. On the way back from the store, Charmaine appeared frustrated and rattled. Charmaine told Davis she had had a conversation with JoAngel. Davis told her not to worry, they would send Henderson to handle it. When they got back from the store, Davis told Henderson what Charmaine had relayed to her, and Henderson said not to worry, he would handle it. Davis asked Henderson to go talk to defendant and he said he would. Subsequently, Peterson gave Henderson a ride over to JoAngel's house. Approximately two to three hours later they found out Henderson had been shot. Davis was unsure as to what time the initial call from JoAngel would have taken place but she guessed it could have been an hour or two prior to the incident.

On the day in question, JoAngel came home at approximately 4:00 p.m. Defendant was at the home at that time and had been watching two of their children. Once JoAngel arrived, she went into her room with three of her young children. A fourth child was in another room. Sometime later, JoAngel heard a pop, left her room to check on the noise, and found Henderson lying on the ground. Defendant asked her to help him get the children to safety, and she complied. JoAngel was unsure what time Henderson had arrived at her home as she had gone directly to her room when she arrived home. JoAngel denied having any sort of heated argument with defendant on the day of the shooting.

JoAngel testified she did not see the shooting take place. She further testified her daughter D. was in the bedroom doing her homework from the time they got home until the shooting. The only exception was when D. left the room briefly to get bottles for the baby. At the time of the shooting, D. was in the bathroom next to the master bedroom.

D., defendant's daughter, was eight years old at the time of trial. She testified she did not see the shooting as she was in the bathroom at the time. She had previously been in her mother's room doing her homework.

Bakersfield police officer Kennisha Short spoke with D. in the hours following the shooting and recorded their conversation. The recording was played for the jury. On the recording, D. told the officer that defendant shot her "Uncle Red" in the head while the two were talking about defendant. They were not arguing. She stated that at the time of the shooting, she was doing her homework at the living room table. Detective Herman Caldas also spoke with D. after the shooting. D. again relayed she had seen defendant shoot Henderson in the head and added she saw defendant put the gun in his pocket afterwards.

Bakersfield police officer Andrea Pflugh was the first officer to arrive after the shooting at approximately 5:00 p.m. She found Henderson with a gunshot wound lying on the floor inside the house. She searched the area around Henderson as well as his person and did not locate any firearms.

Defendant was arrested that same evening. Detective James Moore of the Bakersfield Police Department interviewed defendant after the shooting. Defendant did not give him any information about where he was during the shooting or where the gun was located. In addition, Detective Moore did not observe any injuries to defendant suggesting he was in any sort of physical struggle. Additionally, nothing in the home appeared disturbed.

Bakersfield police officer Ryan Kroeker transported defendant to the jail on the night of the shooting after defendant was interviewed by detectives. On the way, defendant appeared distraught and began crying. The officer asked him what was wrong and defendant replied he had let the detectives down. When asked what he meant, defendant stated, "I should have told them that I dropped my uncle." On cross-examination, defendant's counsel elicited the fact that the officer had also questioned

defendant about the location of the gun used and defendant told him he had given the gun to "Rock" who was later identified as Gregory Allen.

Defendant's friend, Gregory Allen, testified that on the date in question, after the shooting, defendant walked up to him outside a market and asked him to hold a .357 revolver for him until he could come back for it. The following day, Detective Moore contacted Allen, asking about the gun. Allen turned the gun over to the police.

After defendant was arrested, he called Charmaine from jail. She claimed defendant told her he shot Henderson after the two got into a tussle, however, there was no mention of any struggle on the recording of the call which was played for the jury. Charmaine further testified Henderson liked to carry guns, and shortly before the shooting she had seen him with a .357 revolver.

Dr. Thomas Beaver, a forensic pathologist, testified the victim died from a single gunshot wound to the head. The bullet traveled from the front to the back of the head.

Bullet fragments recovered from the victim's brain were compared to bullets that were test fired from the gun defendant had given Allen. A firearms ballistics expert opined the .357 revolver recovered by Detective Moore fired the bullet fragments recovered from the victim's brain.

The parties stipulated defendant had suffered a prior felony conviction within the meaning of former section 12021.

### Defense Case

Defendant testified in his own defense. Defendant had known Henderson his whole life and had spent a lot of time with him except when Henderson had been in prison. According to defendant, Henderson had a violent temper and could become angry very quickly over any perceived wrong or disrespect. Henderson liked to fight and made defendant fight others when he was a child.

Defendant related numerous prior instances where Henderson had been violent towards others. When defendant was a young boy, Henderson "gutted" a man in front of him. Although defendant was present at the time, he also heard about the incident from

5.

other family members.  He had also heard of other incidents from Henderson himself and from others.  Defendant recalled an incident in September of 2009 where Henderson pulled a gun, specifically, a .357 magnum, on Donald Divers.  Divers relayed this incident to defendant.  Henderson did not shoot Divers, and Divers was able to walk away.  Divers also testified regarding this incident, adding that Henderson did not seem to recognize him when he threatened him with the gun and noting defendant was present when the incident occurred.[3]  He also identified the gun in this case as the gun Henderson had used to threaten him.

Defendant recounted another incident which occurred in October of 2009 where Henderson pushed Alisha Blackwell and tried to get other women to fight with her.  This incident was relayed to defendant by Henderson as well as by Davis who was present at the time.

In November of the same year, defendant observed an incident between his mother's neighbor, Ray King, and Henderson.  Defendant was aware Henderson had lost his dog and saw King with a dog that looked similar to Henderson's.  Defendant called Henderson to come look at the dog and, after looking at it, Henderson claimed the dog was his.  When King would not give the dog to Henderson he became angry and threatened King, saying he was a gangster and if he did not get the dog someone would lose a life.  Henderson walked to the car, and defendant followed and calmed him down saying he would get his dog back for him.  The following day, King gave the dog to defendant saying he did not want any problems over the dog.  Defendant gave King $50 for the dog.  King testified to the incident as well, explaining Henderson was very aggressive and threatened to kill him.

During the week of the shooting, defendant learned of an incident where Henderson hit a man when he confronted Henderson over parking in his parking spot.

---

[3]Defendant retook the stand after Divers testified and stated he was present for this incident and he had been mistaken earlier when he testified he only heard about the incident from others.

6.

That same week, defendant learned Henderson had hit a woman, Elizabeth Heard, knocking her out after she confronted Henderson for hitting her child. Heard confirmed this incident and added that Henderson referred to himself as "machete man" because he had gutted a man in his past.

According to defendant, Henderson would not tolerate being disrespected and would take action if he felt he had been disrespected. In fact, Henderson had previously stabbed his own brother over a perceived wrong. That incident occurred about 20 years earlier.

On November 13, 2009, Henderson threatened another man and friend of his, Alden Rowel. While at a party, Rowel had called Henderson's ex-wife for a ride home. When Henderson saw his ex-wife, he ran up and tried to hit her. Defendant intervened by grabbing Henderson and trying to calm him down. Henderson said he would kill Rowel over the incident. After Rowel left, defendant had Henderson's girlfriend take him home.

Approximately 30 minutes later, defendant's aunt called and told him to come get Henderson. Henderson had confronted another man, Tyrone White, with a gun. White told defendant that Henderson put a gun in his face and White had to wrestle Henderson to the ground. Henderson then left.

Regarding the day of the shooting, defendant stated Henderson called him saying he was going to come over and "hang out." Defendant initially told him not to come over if he was on drugs because Henderson had been acting very violently and he did not want to deal with his behavior. Defendant had been very busy trying to keep the peace with others due to Henderson's behavior; he was tired of the situation and having to constantly act as the peacemaker. Even though Henderson had a violent temper and had been acting out a lot recently, defendant allowed him to come over and visit because he was family.

A few days before the shooting, Henderson gave defendant his dog. Defendant did not want to take the dog since Henderson had already gotten into one altercation over the dog, but Henderson insisted. Defendant and Henderson gave the dog to defendant's children as an early Christmas present. On the day of the shooting, while Henderson was

7.

visiting, Henderson said he needed the dog back. Defendant told Henderson he was not going to give him the dog and, technically, it was defendant's dog since he had paid King for it. Henderson became very agitated, began pacing, said "you think I'm playing" and headed toward the house. Defendant followed Henderson, thinking he was going to try to take the dog. As Henderson walked into the house, defendant saw him pull a gun from his waistband. Defendant ran up to Henderson, bear-hugged him, put a hand over the gun, and elbowed him to get possession of the gun. Once he had the gun, defendant pushed Henderson away. Henderson continued to say he was not "playing" and came at defendant. When Henderson came toward him, defendant fired the gun one time and Henderson fell to the ground. At the time he fired the gun, defendant feared for his life because he knew if Henderson pulled a gun he intended to use it. Defendant felt that if Henderson were able to get the gun back, he would have killed him. When he fired the gun, defendant was afraid for his life.

After the shooting, JoAngel came out of her room and defendant saw D. looking at him, although he testified she did not see the shooting. Concerned for his children, defendant put the gun in his pocket, covered D.'s eyes, and asked JoAngel to help him remove the children from the house. After getting all of the children to a neighbor's house, he told JoAngel to call the police. Wanting to get the gun away from the house and kids, defendant left the area on foot.

Defendant later saw Allen and asked him to hold the gun and told him to "give it to the boys if they come looking for it." Defendant explained he did not wait for the police to respond because he had recently gotten out of jail and did not want to go back. He felt the police would not believe him, so he wanted to "tie up a couple loose ends" before turning himself in. He did not tell the police what happened when they interviewed him because he wanted to have a lawyer present; he knew anything he said could be used against him.

8.

Defendant admitted being convicted of felonies in 1999, 2006, and 2008. Defendant identified the .357 magnum revolver that was recovered by Detective Moore as Henderson's gun.

Henderson was about 49 years old and weighed about 130-140 pounds at the time he was shot, while defendant was 33 at the time of trial and weighed 300 pounds. Defendant admitted he was a good fighter and could defend himself well. Although defendant was aware of prior incidents when Henderson had threatened others with a gun, he admitted he knew Henderson never actually shot anyone.

Defendant claimed he did not have a hot temper; however, he did admit to shooting a man in the leg as he was running away from him in 2007, as well as hitting JoAngel on two occasions when they were married.

Bobbie Hawkins, Henderson's ex-girlfriend, testified Henderson often had guns and had held her at gunpoint a few years earlier. She also described an incident where Henderson threatened her cousin with a knife a few months before the shooting.

Several witnesses described defendant as a calm and nonviolent person. Charmaine testified Henderson was a violent man and he could become violent very quickly. She also confirmed Henderson liked to carry guns and she identified the gun in this case as belonging to Henderson. Rowel also testified, confirming Henderson had previously threatened him and that Henderson often carried guns.

Cell phone records belonging to Eric Peterson were admitted into evidence after both sides rested. Officer Richard Dossey obtained JoAngel's cell phone number on the date of the shooting. The records showed nine calls between Eric Peterson and JoAngel on the day of the shooting.

## I. The Gun Evidence Was Properly Admitted

Defendant contends the trial court erred in denying his motion to suppress evidence of the gun as well as the testimony of Allen as these items were obtained in violation of *Miranda* and *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*). Defendant argues the officer's continued questioning of him regarding the gun after he

9.

invoked his right to an attorney required suppression of the above evidence. Plaintiff counters the trial court was correct in its ruling that a violation of the *Miranda/Edwards* rules does not require suppression of physical or third party evidence where the defendant's statements were voluntary. In addition, plaintiff argues the evidence was admissible pursuant to the public safety exception. We find the evidence was properly admitted.

Prior to trial, defendant moved to exclude the gun and any testimony from Allen regarding the gun as the evidence was obtained as the fruit of a *Miranda* violation. The court held an Evidence Code section 402 hearing, where it was established Detective Moore interviewed defendant after the shooting. Prior to beginning the interview, Detective Moore read defendant his *Miranda* rights. At some point during the course of the interview defendant invoked his right to counsel, stating he would prefer to talk to a lawyer. Moore ceased questioning defendant any further and contacted other officers to transport defendant to the jail.

Officer Kroeker escorted defendant to the jail after he was interviewed by Detective Moore. Kroeker was informed defendant had invoked his *Miranda* rights. On the way to the jail, defendant began crying and appeared quite upset. Kroeker asked defendant what was wrong. Defendant replied "[M]an, I let those detectives down." When the officer asked defendant what he meant by that, defendant stated, "I should have told them that I dropped my uncle." Knowing defendant had invoked his rights, Kroeker ceased any further conversation on that topic.

As the officer arrived at the jail, he asked defendant some questions regarding the location of the firearm. He did so out of concern for the public's safety because he knew the gun had not yet been recovered, that the area is populated, and there was an elementary school in the vicinity. In questioning defendant about the location of the gun, the officer explained to defendant it would be a shame for a child to pick up a firearm and have something bad happen. Defendant informed the officer he had given the gun to "my boy Rock." The officer further inquired as to whether Rock was in a vehicle or on foot to

determine whether the gun was possibly still in an area accessible by the public. Defendant explained Rock was on foot and further stated he had told Rock he would be back to pick up the firearm at a later point. The officer subsequently asked defendant to describe Rock so he could identify him.

According to Officer Kroeker, the conversation, which took place in the patrol car, was very casual and informal. The officer explained his entire contact with defendant was respectful. He never raised his voice, displayed any weapons, and did not promise defendant anything during the conversation. Defendant answered the questions in a normal conversational manner without any noticeable time gaps.

The trial court held that defendant had invoked his *Miranda* rights, but his statements to Officer Kroeker were voluntary and not coerced. As the gun was located as a result of the voluntary statement, evidence of the gun itself was admissible. The prosecutor indicated he was not seeking the introduction of defendant's statements regarding the location of the gun as those statements constituted a violation of *Miranda*, and the court agreed those statements would be excluded.[4] He indicated he would, however, be seeking to introduce Allen's testimony regarding his contact with defendant and the resulting gun evidence. When asked if he sought an Evidence Code section 402 hearing on the matter, defense counsel informed the court it would not be necessary as

---

[4]The court also appeared to rule that defendant's statements and resulting gun evidence fell within the public safety exception to *Miranda*. Pursuant to the exception, a defendant's statements taken in violation of *Miranda* are fully admissible when the need for public safety outweighs the need for providing a suspect with his *Miranda* rights. (*New York v. Quarles* (1984) 467 U.S. 649, 653-658.) Under this doctrine, the statements themselves are admissible as an exception to the *Miranda* requirements. (*New York v. Quarles*, at pp. 657-658.) However, the prosecutor in this case seemed to concede the statements made to Officer Kroeker about the gun were inadmissible as violations of *Miranda* even while arguing the public safety exception applied to the facts of this case. Based on the prosecutor's statements, the court ruled the statements were inadmissible, which would be at odds with a finding that the public safety exception applied. We need not address this curiosity because were this court to assume defendant's statements were taken in violation of *Miranda*, the resulting physical evidence would still be admissible.

11.

the court's ruling regarding the gun evidence would require the defense to produce evidence regarding all of defendant's statements regarding the gun.

*Analysis*

We begin with a brief review of the well-settled principles regarding *Miranda* and *Edwards*.

> "As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' [Citations.] If the suspect knowingly and intelligently waives these rights, law enforcement may interrogate, but if at any point in the interview he invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' [Citations.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 947.)

In *Edwards*, the United States Supreme Court "superimposed a 'second layer of prophylaxis'" to implement *Miranda* when a suspect invokes his right to counsel. (*Maryland v. Shatzer* (2010) 559 U.S. 98, 104.)

> "[A]n accused …, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Edwards*, *supra*, 451 U.S. at pp. 484–485.)

The Supreme Court has "frequently emphasized that the *Edwards* rule is not a constitutional mandate, but a judicially prescribed prophylaxis." (*Shatzer*, *supra*, at p. 105.) And "[b]ecause *Edwards* is 'our rule, not a constitutional command,' 'it is our obligation to justify its expansion.'" (*Ibid*.)

Defendant argues the failure to honor the invocation of his right to counsel requires the suppression of any evidence obtained as a result of further questioning under the "fruits" doctrine of *Wong Sun v. United States* (1963) 371 U.S. 471. While acknowledging the United States Supreme Court has rejected this very argument in the

12.

context of the failure to provide *Miranda* warnings (*United States v. Patane* (2004) 542 U.S. 630), he contends a different rule should apply when the derivative evidence is obtained in violation of *Edwards*. The deliberate failure to honor the invocation of these rights, defendant argues, requires the imposition of the "fruits" doctrine. We disagree.

In *United States v. Patane*, the Supreme Court held the failure to provide warnings in accordance with *Miranda* does not require the suppression of physical fruits of the unwarned statement. (*United States v. Patane*, *supra*, 542 U.S. at pp. 641-644.) There, the defendant was arrested for violating a restraining order. (*Id*. at p. 635.) Officers also had information the defendant was in illegal possession of a firearm. (*Id*. at p. 634.) Upon his arrest, officers attempted to read the defendant his *Miranda* rights. However, he interrupted, asserting he knew his rights and the rights were never fully provided. (*Patane*, at p. 635.) The officers proceeded to question the defendant about the presence of a gun and the defendant ultimately provided information to its location. (*Ibid*.) The question before the Supreme Court was "whether a failure to give a suspect the warnings prescribed by *Miranda* … requires suppression of the physical fruits of the suspect's unwarned but voluntary statements." (*Id.* at pp. 633-634.)

In answering the question in the negative, the Supreme Court, in a plurality opinion authored by Justice Thomas, pointed out that the core purpose of the Fifth Amendment's self-incrimination clause is to protect a defendant from being compelled to testify against himself at trial. (*United States v. Patane*, *supra*, 542 U.S. at p. 637.) The court explained "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause," which "is not implicated by the admission into evidence of the physical fruit of a voluntary statement." (*Id*. at p. 636.) This is because the admission of physical evidence obtained through voluntary statements cannot violate the right against self-incrimination as the right itself is a *trial* right. (*Id*. at pp. 637, 641.)

Because the *Miranda* rule is a prophylactic measure that "necessarily sweep[s] beyond the actual protections of the Self-Incrimination Clause," its extension "must be

13.

justified by its necessity for the protection of the actual right against compelled self-incrimination." (*United States v. Patane*, *supra*, 542 U.S. at p. 639.) As the right against self-incrimination is fundamentally a trial right, it is not violated "by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*." (*Id*. at p. 641.) Rather, "violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point '[t]he exclusion of unwarned statements … is a complete sufficient remedy' for any perceived *Miranda* violation." (*Id*. at pp. 641-642.) Thus, there is no reason to exclude fruits of unwarned statements. (*Patane*, at p. 642.) Similarly the court rejected a deterrence argument, noting that admitting nontestimonial fruit of a voluntary statement "presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." (*Id*. at p. 643.) Consequently there is no reason to extend the rule to that context.

We find the reasoning of *United States v. Patane* to be fully applicable to a situation such as this, where there is continued questioning after the invocation to the right to counsel. As we have already noted, the rule requiring cessation of questioning after a suspect invokes the right to counsel is simply a second layer of prophylaxis to protect the rule announced in *Miranda*. (*Maryland v. Shatzer*, *supra*, 559 U.S. at p. 105.) Furthermore, like *Miranda*, the rule in *Edwards* sweeps more broadly than the constitutional right it protects, therefore, its expansion must be limited to the right it protects. (*Maryland v. Shatzer*, *supra*, at p. 105 ["because *Edwards* is 'our rule, not a constitutional command,' 'it is our obligation to justify its expansion'"].) Similarly, like *Miranda*, the *Edwards* rule simply creates a generally irrebuttable presumption of coercion when statements are obtained outside of its mandates forbidding the use of such statements in the prosecution's case-in-chief. (*Id*. at pp. 106-111 [after a 14-day break in custody, *Edwards* presumption no longer applies]; *Oregon v. Hass* (1975) 420 U.S. 714, 722 [defendant's statements after requesting an attorney admissible to impeach defendant's testimony]; *People v. Peevy* (1998) 17 Cal.4th 1184, 1193 [statement taken

in deliberate violation of *Edwards*, while inadmissible in prosecution's case-in-chief, is admissible to impeach defendant's testimony].)

Further, longstanding Supreme Court precedent supports this conclusion. In *Michigan v. Tucker* (1974) 417 U.S. 433, the Supreme Court declined to extend the exclusionary rule to suppress testimony of a witness who was discovered as a result of a defendant's statement taken in violation of *Miranda*. Likewise, in *Oregon v. Elstad* (1985) 470 U.S. 298, the court declined to extend the "fruit" analysis to a situation where an initial unwarned statement was followed by a subsequent statement which was properly *Mirandized*. The court held it "is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." (*Elstad*, at p. 309.) More recently, in *Missouri v. Seibert* (2004) 542 U.S. 600, a majority of the court continued to reject using the "fruit" analysis in a sequential confession case. (*Id.* at p. 612, fn. 4 (plur. opn. of Souter, J.) ["*Elstad* rejected the *Wong Sun* fruits doctrine for analyzing the admissibility of subsequent warned confession following 'an initial failure … to administer the warnings required by *Miranda*'"]; *id.* at p. 623 (dis. opn. of O'Connor, J.) ["the plurality appropriately follows *Elstad* in concluding that Seibert's statement cannot be held inadmissible under a 'fruit of the poisonous tree' theory"].)

In *People v. Whitfield* (1996) 46 Cal.App.4th 947, this court had occasion to analyze the *Elstad* and *Michigan v. Tucker* decisions in determining whether the "fruits" doctrine applied to physical evidence obtained by a noncoercive *Miranda* violation. After reviewing those cases we held, as did the United States Supreme Court later did in *Patane*, that the reasoning of those cases applied equally to physical evidence obtained from a *Miranda* violation. (*Whitfield*, at p. 957.) There we explained:

> "the United States Supreme Court has stated unequivocally, in *Elstad* and *Tucker*, that a noncoercive *Miranda* violation is not a constitutional violation. As the *Elstad* court stated in summarizing *Tucker*, 'Since there

15.

was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed ….' (*Oregon v. Elstad*, *supra*, 470 U.S. at p. 308.) Thus, while the high court has not actually decided a case involving physical evidence seized as a result of a *Miranda* violation, it has decided the premise from which it necessarily follows that physical evidence seized as a result of a noncoercive *Miranda* violation is not excludable under the *Wong Sun* doctrine." (*Ibid*.)

Likewise here, it is clear from a review of *United States v. Patane* that the United States Supreme Court has decided the premise which controls this case. As the court has held, the admission of nontestimonial physical "fruit" of a voluntary statement does not implicate the self-incrimination clause. (*United States v. Patane*, *supra*, 542 U.S. at pp. 641-642.)

Indeed our own Supreme Court has indicated its willingness to apply *United States v. Patane* to an *Edwards* violation in *People v. Davis* (2009) 46 Cal.4th 539, 598-599. There the California Supreme Court noted that a violation of *Miranda* and *Edwards* would not "taint the admissibility of any *physical evidence* derived from those confessions." (*Davis*, at p. 598.) Citing *Patane*, the court explained the "fruit" doctrine does not apply to noncoercive *Miranda* violations, and further pointed out that a violation of *Edwards* "does not mean that any ensuing confession was coerced." (*Davis*, at p. 598.) *Davis* discussed these principles in determining that any admission of statements taken in violation of *Edwards* was harmless, as the derivative physical evidence would have nevertheless been fully admissible. (*Davis*, at pp. 598-599.)

Defendant argues that applying the exclusionary rule to fruits of an *Edwards* violation would provide an appropriate deterrent for police from intentionally violating a suspect's rights. We disagree. Like the court articulated in *Patane*, the exclusion of a suspect's statements from trial is a complete remedy for the violation of the right against self-incrimination. (*United States v. Patane*, *supra*, 542 U.S. at pp. 642-643.) As the *Edwards* rule provides a right over and above that required by the Fifth Amendment, extension of the rule to that context is unwarranted. Further, as to a deterrent effect, we

16.

note that under well-settled law, not only are statements obtained by a violation of *Edwards* already inadmissible, but so are the fruits of an actually coerced statement. (*Patane*, at p. 644.)

Further, the Supreme Court in *Oregon v. Hass* rejected a similar deterrence argument. There, the court held that a statement taken after valid *Miranda* warnings were given and the defendant requested to speak to an attorney, while not admissible in the prosecution's case-in-chief could, in fact, be admitted to impeach the defendant's contrary testimony. (*Oregon v. Hass*, *supra*, 420 U.S. at pp. 721-723.) The court explained that while one could argue that an officer may have an incentive to question a suspect further after the invocation of the right to counsel in the hopes of securing impeachment evidence, those cases could "be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness." (*Id*. at p. 723.) Indeed, when a statement is taken in violation of *Edwards* and found to be involuntary, it is excluded for all purposes. (*People v. Neal* (2003) 31 Cal.4th 63, 79-85.)

We note several state Supreme Courts as well as some federal circuit courts have come to the same conclusion. (*Baker v. State* (Tex.App. 1997) 956 S.W.2d 19, 22-23 ["fruits" doctrine inapplicable to noncoercive violation to honor invocation of *Miranda* rights]; *In re H.V.* (Tex. 2008) 252 S.W.3d 319, 327-329 [same]; *People v. Bradshaw* (Colo. 2007) 156 P.3d 452, 459-460 [continued questioning of suspect after invocation of right to counsel did not invalidate subsequent voluntary consent to mouth swab that led to admission of inculpatory DNA evidence]; *People v. Gosselin* (Colo.App. 2008) 205 P.3d 456, 460-461 [physical "fruit" of *Edwards* violation obtained from voluntary statement admissible] cert. den. *sub nom. Gosselin v. People* (Colo. Apr. 13, 2009, 08SC978) and *Gosselin v. Colo.* (2009) 558 U.S. 1026; *Wilson v. Zant* (1982) 249 Ga. 373, 377-379 ["the exclusionary rule does not apply to evidence derived from a voluntary statement[] obtained in violation of *Edwards*, … and that it was not error to admit the 'fruits' of the defendant's statement"], overruled on other grounds in *Morgan v. State* (1996) 267 Ga. 203; *Taylor v. State* (2001) 274 Ga. 269, 276 [553 S.E.2d 598, 604-605] [exclusionary

17.

rule does not apply to physical "fruit" of voluntary *Edwards* violation]; *United States v. Cherry* (5th Cir. 1986) 794 F.2d 201, 207-208 ["fruits" doctrine does not apply to *Edwards* violation where underlying statement was voluntary]; *U.S. v. Gonzalez-Garcia* (5th Cir. 2013) 708 F.3d 682; 686-687 [*Edwards* violation does not require suppression of physical "fruits" of statement]; *Martin v. Wainwright* (11th Cir. 1985) 770 F.2d 918, 928 [police failure to honor suspect's request to "cut off" questioning does not make fruits of ensuing voluntary confession inadmissible], aff. as mod. (11th Cir. 1986) 781 F.2d 185, abrogated on other grounds in *Coleman v. Singletary* (11th Cir. 1994) 30 F.3d 1420; *U.S. v. Mendoza-Cecelia* (11th Cir. 1992) 963 F.2d 1467, 1474 ["fruits" doctrine did not bar use of subsequent voluntary confession after suspect invoked right to counsel], abrogated on other grounds in *Coleman v. Singletary* (11th Cir. 1994) 30 F.3d 1420; see *Greenawalt v. Ricketts* (9th Cir. 1991) 943 F.2d 1020, 1026-1027 [following *United States v. Cherry* finding that "a voluntary confession inadmissible on the ground of *Edwards* does not taint a subsequent voluntary confession].)

Defendant argues this court should follow the decision in *State v. Venegas* (Fla.App. 2012) 79 So.3d 912. There, a Florida appellate court declined to apply *United States v. Patane* to a situation where a defendant was advised of and invoked his *Miranda* rights, but was subsequently questioned resulting in the discovery of physical evidence. The court reasoned that *Patane* did not apply because the defendant had been advised of and invoked his right to counsel. In distinguishing *Patane*, the court stated that the defendant's statement could not be considered voluntary simply because it occurred after the defendant invoked his right to counsel. (*State v. Venegas*, *supra*, at p. 915.) However, our own Supreme Court has held that mere questioning after a suspect invokes his right to counsel is not necessarily coercive. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1040; *People v. Storm* (2002) 28 Cal.4th 1007, 1033; *People v. Davis*, *supra*, 46 Cal.4th at p. 598.) Thus, as the reasoning in *Venegas* conflicts with our own California Supreme Court, we decline to follow its holding.

18.

Concluding that fruit of the poisonous tree doctrine does not apply to the physical evidence in the case, namely the firearm as well as Allen's testimony, does not end our analysis. We must also consider whether defendant's statement was in fact voluntary and not coerced.

The rules regarding whether a statement is voluntary are well-settled. A statement is considered involuntary "if it is not the product of "'a rational intellect and free will.'" [Citation.] The test for determining whether a confession is voluntary is whether the [witness's] 'will was overborne at the time he confessed.'" (*People v. Maury* (2003) 30 Cal.4th 342, 404.) A statement may be coerced by either physical intimidation or psychological pressure. In cases of psychological coercion, the question is """"whether the influences brought to bear upon the accused were 'such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined.' [Citation.]""" (*Ibid.*) """"The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable."""" (*People v. Williams*, *supra*, 49 Cal.4th at p. 436; see also *People v. Ray* (1996) 13 Cal.4th 313, 340; *People v. Thompson* (1990) 50 Cal.3d 134, 166-167.)

Defendant does not argue his statements as to the location of the gun were coerced, and nothing in the record would support such a conclusion. The record does, however, support a finding that defendant voluntarily made the statements regarding the location of the gun to Officer Kroeker. The officer testified that upon arriving at the jail, he had said something to the effect that it would be a shame if a child were to come across the gun and be harmed. Defendant then immediately provided the officer with the statement that he had given the gun to "Rock." Officer Kroeker testified he made no threats toward defendant, the exchange was in a conversational tone, and defendant answered the question without delay. No weapons were used, nor was there any evidence that defendant was in any way badgered into making the statement. It appeared to be a very short exchange during which defendant freely made the statement. As there is no

19.

hint of compulsion on the record, we find the subsequent fruits of the statement were fully admissible.

## II.     Admission of the Phone Records Was Proper

Defendant argues the trial court abused its discretion in admitting evidence of cell phone records as the evidence was irrelevant.  We disagree.

Evidence Code section 351 provides that "all relevant evidence is admissible" unless it is otherwise prohibited.  Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id.*, at § 210.)  "Evidence is relevant if it tends "'logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.'"  (*People v. Williams* (2008) 43 Cal.4th 584, 633-634.)  A trial court enjoys broad discretion in determining the relevancy of evidence.  (*People v. Cash* (2002) 28 Cal.4th 703, 727.)  We review a trial court's rulings on relevance and the admissibility of evidence for abuse of discretion.  (*People v. Aguilar* (2010) 181 Cal.App.4th 966, 973.)

Defendant contends the evidence of the phone records was irrelevant because there was no evidence showing the phone records at issue belonged to the same Eric Peterson referred to by the witnesses.  Defendant is mistaken.

Evidence at trial established JoAngel's phone number.  The phone records, admitted as People's exhibit 57, included a summary page establishing the records belonged to "Eric Peterson" and listed a Bakersfield address.  The phone number belonging to Peterson is listed.  The records themselves showed nine telephone calls between JoAngel's phone number and Peterson's on the day of the shooting, which would establish this was in fact the same Peterson to which the witnesses referred.

Additionally, Davis testified Charmaine took a phone call from JoAngel sometime before coming back from the store and that afterwards she was frustrated and rattled.  She relayed that only she, Charmaine, and Peterson went to the store together, and the phone call took place a few hours before the shooting.  Davis recalled that Peterson had a phone number with a 510 area code and the phone records at issue were for a phone number

20.

with a 510 area code. The records further established there was a phone call between Peterson's and JoAngel's telephones at 3:12 p.m., exactly within the time frame to which Davis testified. This further establishes the relevance of the records at issue.

Moreover, Charmaine testified Peterson was with her on the day of the shooting and he had given Henderson a ride to JoAngel's home. She claimed she had not spoken to JoAngel before the shooting because she did not have a cell phone at the time and JoAngel did not have Peterson's phone number. However, Charmaine further stated she called JoAngel sometime after the shooting, while she was with Peterson, and JoAngel told her to come over immediately but did not tell her what had happened. The phone records at issue show a very brief call from Eric Peterson's phone to JoAngel at 6:21 p.m., which further established the records in question were for the same Eric Peterson involved in this case.

JoAngel testified she did not know anyone by the name of Eric Peterson. However, the records show nine telephone calls between JoAngel's number and the number listed for Peterson on the day of the shooting. This further establishes the relevance of the records.

In light of the above testimony, the records were relevant to corroborate Davis's testimony that Charmaine took a call from JoAngel on the date in question, and also to impeach JoAngel's testimony that she did not know anyone by the name of Eric Peterson. Defendant's main argument is that the records are irrelevant because they could have belonged to another Eric Peterson and had nothing to do with this case. However, defendant's arguments go to the weight of the evidence, not its admissibility. (*People v. Sorrentino* (1956) 146 Cal.App.2d 149, 162.) Considering the above testimony in light of the actual phone records, it is clear that a reasonable person could conclude that the records belonged to the Eric Peterson to whom the witnesses referred, and the jury could give those records whatever weight they saw fit. Thus, the records were relevant and properly admitted.

Defendant argues the phone records were irrelevant because they did not demonstrate a call between JoAngel and Peterson within a few hours of the shooting as she testified. First, we note the timing of the calls would go to the weight of the evidence, not its admissibility. Second, a review of the actual phone logs at issue reveals there was in fact a 32-second call between Peterson's and JoAngel's telephones at 3:12 p.m., exactly within the time frame defendant argues would be consistent with the testimony. This, of course, is entirely consistent with Davis's testimony that Charmaine and JoAngel spoke shortly before Henderson went to JoAngel's house, and that the call occurred a few hours before the shooting.

As the records were relevant, the trial court did not err in admitting them. Even if this court were to conclude the records were irrelevant, we would find any error harmless. The erroneous admission of the evidence does not require reversal of the judgment unless it is reasonably probable defendant would have obtained a more favorable result had there been no error. (*People v. Earp* (1999) 20 Cal.4th 826, 878.) The admission of the phone records added little to the case. The issue presented to the jury was whether defendant killed Henderson with premeditation or if he was acting in self-defense. At most, the challenged evidence shows there were calls between JoAngel's phone and Peterson's phone on the day in question. However, the fact of the phone call does not establish what was said on the call. Defendant seems to argue the phone records somehow established the prosecution's theory that Henderson came to the home at JoAngel's request. But there was never any evidence regarding the content of the call, and the admission of the records did not change that in any way. Davis had already testified that Charmaine spoke to JoAngel sometime before Peterson drove Henderson to JoAngel's house. While the records corroborate a conversation took place, that is all they could establish. Defendant argues the jury obviously relied on the phone records in deliberations. To support this conclusion he points to the fact the jury requested to see the records during deliberations. However, defendant neglects to mention the jury never had the opportunity to observe the records during trial. Indeed, the records were not even

22.

admitted until both parties had rested their cases.  The records were mentioned by both the prosecutor and defense in their closing arguments.  As that is the first time they were ever mentioned, it is hardly surprising the jury requested to see them.

Considering the record as a whole, the admission of the records was clearly harmless.

## DISPOSITION

The judgment is affirmed.


_____

PEÑA, J.

WE CONCUR:


_____

CORNELL, Acting P.J.


_____

KANE, J.

23.